**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF OHIO EASTERN DIVISION,
YOUNGSTOWN**

BRENDA SMITH, DEBBIE PUGAR, JOHN PUGAR, ALVIN DONALDSON, individually, and on behalf of all others similarly situated,

    Plaintiff,

  v.

NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN RAILWAY COMPANY,

    Defendants.

Case No.

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiffs Brenda Smith, Debbie Pugar, John Pugar, and Alvin Donaldson (collectively "Plaintiffs'), individually, and on behalf a putative class of all other similarly situated ("Class Members" or "Class"), hereby allege against Defendants Norfolk Southern Corporation ("NSC") and Norfolk Southern Railway Company ("NSRC") (collectively "Defendants") and based on personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based on investigation, as follows:

**INTRODUCTION**

1. Plaintiffs bring this case, seeking damages and equitable relief, individually and on behalf of the other Class Members, each of whom are residents, employees, property owners, or business owners located in the area and within a radius affected by the February 3, 2023 Norfolk Southern Freight Train 32N derailment (the "Derailment") and the subsequent "controlled release"

2.      in the form of a so-called "controlled burn" of massive amounts of toxic chemicals including, but not limited to, vinyl chloride, buytl acrylate, benzene residue and combustible liquids, including in East Palestine, Ohio, which resulted in contamination of the area proximate to the Derailment, including property of all kinds, air, surface and ground water and inhalation of such toxins and contaminants.  As a result of the Derailment, Plaintiffs and members of the Class have been damaged and have suffered, among other things, loss of use and enjoyment of property, and/or property damage, and/or contamination, and/or diminution in value of property, and/or emotional distress, and/or inhalation of contaminants causing injury and/or requiring medical monitoring, and/or economic damages, as more fully alleged below.

3.      Vinyl chloride is a known Group A carcinogen. According to the U.S. Environmental Protection Agency (EPA), short term exposure to high levels of vinyl chloride through inhalation can cause dizziness, drowsiness and headaches. Prolonged exposure can result in organ damage and various cancers.

4.      Plaintiffs Brenda Smith, Debbie Pugar, John Pugar, and Alvin Donaldson are each similarly situated persons who live, own property, work, or own businesses within 30 miles of the site of the Derailment of Norfolk Southern Freight Train 32N and the subsequent "controlled release" of toxic chemicals in East Palestine, Ohio, and seek damages and/or injunctive relief as alleged below.

**JURISDICTION AND VENUE**

5.      This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in the Northern District of Ohio.

## THE PARTIES

7.     At all relevant times, plaintiff Brenda Smith has been an adult citizen of Ohio and resides in East Liverpool, approximately seventeen and a half miles from the Derailment site.

8.     At all relevant times, plaintiffs Debbie and John Pugar have been adult citizens of Pennsylvania and are the owners-occupiers of real property in Beaver Falls, approximately twelve and a half miles from the Derailment site.

9.     At all relevant times, plaintiff Alvin Donaldson has been an adult citizen of Ohio and is the owner-occupier of real property in Wellsville, approximately fifteen miles from the Derailment site. Plaintiff Donaldson works at a location approximately four miles from the Derailment site.

10.     Defendant NSC is a Virginia corporation with its principal place of business at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

11.     Defendant NSRC is a wholly owned subsidiary of NSC. NSRC is a Virginia corporation with its principal place of business at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

12.     At all relevant times, NSC and NSRC acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors and/or agents.

## FACTUAL ALLEGATIONS

13.     On Friday February 3, 2023, Norfolk Southern Freight Train 32N was carrying abnormally dangerous and ultra-hazardous chemicals including, but not limited to, vinyl chloride

and butyl acrylate. Twenty of the train's cars were carrying the hazardous materials, which included vinyl chloride, sulfuric acid, ethylene glycol monobutyl ether, butyl acrylate, benzene residue, and combustible liquids.

14.     At about 8:54 p.m., some 38 of the train's cars derailed on Track 1 of the NS Fort Wayne Line of the Keystone Division in East Palestine, Ohio. Eleven of the derailed tanker cars contained hazardous chemicals spilled onto the ground and were subsequently ignited which damaged other rail cars that had not derailed. The spilled chemicals contaminated the ground, the atmosphere, waterways, including the sub-surface water table, and the contamination continued to be released in the so-called "controlled burn" conducted subsequently.

15.     Prior to the Derailment, and approximately 20 miles before reaching East Palestine, OH, flames could be seen emanating from the train.

16.     The train was "back-loaded" with 40% of its weight in the rear third of the train.

17.     The train derailed after a railcar axle failed when a wheel bearing overheated, leading to a fire and then derailment.[1]  The resultant fire was large enough to be seen on Pittsburgh weather radar.[2]  The resulting smoke plume reached Beaver Falls, Pennsylvania by 10:40 p.m. on Friday, February 3, 2023. Shortly before the Derailment, the crew of Freight Train 32N was alerted by an alarm indicating the existence of a mechanical issue. The crew applied the emergency brake and the train derailed. 38 cars derailed and were damaged, and many of the damaged railcars breached spilling their contents and contaminating everything in the surrounding area as well as the air and surface and ground water.

---

[1] NTSB Issues Investigative Update on Ohio Train Derailment (accessed February 28, 2023).

[2] East Palestine, Ohio train derailment fire was visible on Pittsburgh, Pennsylvania radar (wkbn.com) (accessed February 28, 2023).

18.     Defendants failed to extinguish the fire, which continued to burn until February 8, 2023.

19.     Officials issued a shelter-in-place order for the entire town of East Palestine, affecting roughly 5,000 people. An evacuation order was put in effect within a mile of the Derailment at 1020 East Taggart Street as of early Saturday, February 4, 2023. Residents of Mahoning County and other surrounding communities were advised to stay indoors and shelter in place on February 6, 2023.

20.     At or around 4:30 p.m. on Monday, February 6, 2023, NSC and/or NSRC intentionally conducted a "controlled release" or so-called "controlled burn" which created a large plume of thick black smoke and a mushroom cloud which dispersed toxic hydrogen chloride and phosgene gas into the atmosphere, causing further contamination by, and exposure to, toxic chemicals. The plume was ultimately trapped by an inversion layer at approximately 3000 feet, and it then spread horizontally like a thick cloud, as demonstrated in the following photo:[3]



---
[3] East Palestine, Ohio train derailment fire was visible on Pittsburgh, Pennsylvania radar (wkbn.com) (accessed February 28, 2023).

21.     Upon information and belief, the "controlled release" of vinyl chloride released hundreds of thousands of pounds of phosgene and hydrogen chloride into the air, the latter of which was used as a weapon in World War I.[4]

22.     Fumes, sediment, and a rise in particulate matter from the derailment, fire, toxic chemical disbursement and subsequent explosion have been reported throughout an area extending far beyond the borders of East Palestine. Such particulate matter is particularly dangerous to health and has been linked to eye, lung and throat irritation, trouble breathing, and lung cancer among other health issues.

23.     The EPA particulate pollution monitor in Youngstown, Ohio, more than 20 miles from the derailment site, detected concentrations of fine particulate matter that increased by five times normal levels between February 3 and February 8, 2023.

24.     Upon information and belief, contamination and damage to local streams, rivers and other bodies of water, including ground water, occurred from the release of toxic chemicals and/or the water runoff from the derailment and resulting chemical explosion, leading to the death of fish, wildlife and other local farm or household animals.

25.     According to the EPA,

"[r]eleases of hazardous substances occurred after the derailment and subsequent fires. Releases to the air occurred when hazardous substances spilled from the rail cars, when smoke from burning rail cars was produced, and hazardous substances including vinyl chloride, phosgene and hydrogen chloride were released. Releases to surface water occurred when liquid product exited rail cars and also when run-off from firefighting efforts at the derailment location moved through a ditch to Sulphur Run, which joins Leslie Run, to Bull Creek, to North Fork Little Beaver Creek, to Little Beaver Creek, and then the Ohio River. Releases to soil occurred (1) when liquid product exited rail cars after the derailment (2) when run-off from firefighting efforts at the derailment location flowed from the right-of-way to adjoining property, and (3) when ash from the burns landed on soil. Local citizens

---

[4] Concerns remain after East Palestine spill and plume | News, Sports, Jobs - The Herald Star (heraldstaronline.com) (accessed February 28, 2023)

reported smoke from the burns observed over the State of Ohio and the Commonwealth of Pennsylvania."[5]

26.     To date, at least 3,150 cubic yards of contaminated soil have been removed from the area of the derailment. A total of 942,000 gallons of contaminants and contaminated liquid have been removed from the immediate site.[6]

27.     Defendants failed to immediately report the derailment, and did not inform federal authorities until nearly two hours after the derailment. Defendants further failed to provide firefighters with information as to the hazardous materials on board, which allowed the fire to continue to grow and impeded first responders' ability to extinguish it. In addition, Defendants failed to explore alternative courses of action to the controlled burn, preferring instead to re-open the tracks as quickly as possible. Defendants' failure to convey key information hampered authorities' ability to evaluate and explore safer alternatives to the controlled burn.

28.     Upon information and belief, Defendants discharged more than 1,000,000 pounds of vinyl chloride and other hazardous materials into the environment, with a reach that dwarfs the mandatory evacuation and shelter in place orders and which will have long-range and long-term consequences.

29.     Upon information and belief, the derailment, subsequent chemical spill, fire, toxic explosion and days-long fire were caused by the negligence, carelessness, recklessness and/or intentional acts of the Defendants in the ownership, operation, inspection, maintenance and repair of the subject train, rail cars and track system, as well as the design and performance of the so-called "controlled release."

---

[5] CERCLA Docket No. V-W-23-C-004.

[6] East Palestine Update - 2/16/23 - 1:15 p.m. | Governor Mike DeWine (ohio.gov) (accessed February 28, 2023).

*Plaintiffs and Class Members Were Exposed to Toxic Fumes and Substances as a Result of Defendants' Actions.*

30.     Train 32N was carrying a number of hazardous materials, including vinyl chloride, sulfuric acid, ethylene glycol monobutyl ether, butyl acrylate, benzene residue and combustible liquids.

31.     Vinyl Chloride monomer ("vinyl chloride") is classified by the Department for Health and Human services as known to be a human carcinogen.[7] The Environmental Protection Agency (EPA) has classified it as carcinogenic by the inhalation, oral, and dermal routes.[8]

32.     Vinyl chloride exposure can cause dizziness, headaches, fatigue, respiratory tract irrigation, wheezing, chemical bronchitis, nausea, vomiting, and diarrhea.[9] Exposure to vinyl chloride can cause liver injury and liver cancer and neurologic or behavioral symptoms.[10]

33.     Specifically, just minutes of exposure to high, but attainable concentrations (over 1,000 ppm) of vinyl chloride may cause central nervous system depression with effects such as dizziness, drowsiness, disorientation, tingling, numbness or burning sensation of the hands and feet, impaired vision, nausea, headache, difficulty breathing, cardiac arrhythmias, unconsciousness, or even death.

34.     The Occupational Safety and Health Administration (OSHA) mandates that no employee may be exposed to vinyl chloride at concentrations greater than 1 ppm averaged over

---

[7] Vinyl Chloride | ToxFAQs™ | ATSDR (cdc.gov) (accessed February 28, 2023).

[8] Vinyl Chloride | ToxFAQs™ | ATSDR (cdc.gov) (accessed February 28, 2023).

[9] Vinyl Chloride | Medical Management Guidelines | Toxic Substance Portal | ATSDR (cdc.gov); vinyl-chloride.pdf (epa.gov) (accessed February 28, 2023)

[10] Vinyl Chloride | Medical Management Guidelines | Toxic Substance Portal | ATSDR (cdc.gov); (accessed February 28, 2023).

any 8-hour period; no employee may be exposed at concentrations greater than 5 ppm averaged over any period not exceeding 15 minutes; and that no employee may be exposed to vinyl chloride by direct contact with liquid vinyl chloride.

35.     The substance's odor threshold – the concentration when most people can smell it – is 3,000 ppm in the air, according to the ATSDR.[11]  According to the CDC, odor is not an adequate warning of hazardous concentrations of vinyl chloride.[12]  In other words, the threshold at which an odor is detectable – as residents of East Palestine have reported – far exceeds the maximum exposure mandated by OSHA.

36.     Plaintiffs and the Class Members have been exposed to toxic substances and fumes as a result of Defendants' actions, and will continue require medical monitoring over and above what they would have if they were not exposed to known carcinogens as a result of the derailment. The increased threat to the Plaintiffs' and Class Members' health can only be mitigated with a comprehensive monitoring program.

37.     As a direct result of the derailment and subsequent release of toxic chemicals into the environment covering an area of many miles, Plaintiffs and Class Members have suffered damage to their residences, and/or loss of use of their property and/or physical symptoms of exposure to the hazardous chemicals released into the environment by the Defendants among other damages and consequences. Their residences within the contamination or exposure radius or area have also suffered stigma.

---

[11] Vinyl Chloride | Medical Management Guidelines | Toxic Substance Portal | ATSDR (cdc.gov) (accessed February 28, 2023).

[12] Vinyl Chloride | Medical Management Guidelines | Toxic Substance Portal | ATSDR (cdc.gov) (accessed February 28, 2023).

*Brenda Smith*

38.    Since February 3, 2023, Brenda Smith has suffered symptoms, including respiratory symptoms, headaches, nausea, and skin rashes from bathing, all as a result of the derailment and subsequent release of toxic chemicals into the environment and water supplies.

39.    Plaintiff Smith relies on aquifer water supply for the water source to her apartment, and continues to rely on bottled water for consumption.

*Debbie and John Pugar*

40.    Since February 3, 2023, Debbie and John Pugar (the "Pugars") have each suffered symptoms, including respiratory symptoms as a result of the derailment and subsequent release of toxic chemicals into the environment and water supplies.

41.    The Pugars report the smell of chemicals in the air, especially when the weather is windy or raining, as a result of the derailment and subsequent release of toxic chemicals into the environment.

42.    The Pugars voluntarily evacuated their home for a reasonable period of time following the Derailment.

43.    The Pugars have regularly used a recreational park and pool in East Palestine and report concerns that the recreational park and pool have been contaminated as a result of the derailment and subsequent release of toxic chemicals into the environment.

44.    The Pugars own their home and have been harmed by any diminution in value of their real property.

*Alvin Donaldson*

45.     Since February 3, 2023, Alvin Donaldson has suffered symptoms, including respiratory symptoms, including coughing blood and discharge of blood from his nasal passages as a result of the derailment and release of toxic chemicals into the environment and water.

46.     Donaldson works at a location approximately four miles from the Derailment site and as a result experienced direct exposure to the toxic chemicals released into the environment.

47.     Donaldson owns his home and has been harmed by any diminution in value of his real property.

## CLASS ALLEGATIONS

48.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b) on behalf of herself and a class of all other similarly situated for all direct, proximate and foreseeable losses caused by the February 3, 2023 Derailment, fire and resulting toxic chemical explosion. The Class is hereby defined as follows:

> **All individuals who resided, owned property, worked or operated businesses within a 30-mile radius of 1020 East Taggart Street, East Palestine, Ohio 44413 as of February 3, 2023 ("Class Zone").**



*Fig. 1: The Class Zone is represented by a radius of 30 miles emanating from the derailment, fire and explosion site.*

49.     Excluded from the Class are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class; government entities; and the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the February 3, 2023 Derailment and resulting toxic chemical explosion, arise out of a right of subrogation, whether equitable, contractual or otherwise.

50.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1):** The members of the Class are so that the joinder of all members is impractical. The exact number of Class Members is unknown to Plaintiffs at this time; the proposed Class includes thousands of residents and/or business owners who were exposed to or who had property contaminated by the hazardous chemicals being transported by Norfolk Southern and suffered damages as a result. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

51.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

      a)  whether Defendants' acts or omissions as set forth above caused the accident resulting in the derailment, fire, and subsequent chemical leaks;

      b)  whether Plaintiffs and Class Members have suffered a loss of use and enjoyment of property, property damage, diminution of property value and stigma, expenses or other economic damages as a result of the Defendants' acts or omissions as set forth above;

e) whether Defendants are liable to Plaintiffs and the Class for punitive damages resulting from the derailment;

g) whether medical monitoring and early detection will provide benefits to Plaintiffs and the Class; and

h) whether Plaintiffs and the Class are entitled to relief.

52. **Typicality – Federal Rules of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of the claims of the Class Members and arise from the same actions by Defendants. Plaintiffs and Class Members own property, reside in and/or operate a business within the Class Zone surrounding the Derailment, and owned property, resided and/or operated a business in the Class Zone for at all relevant times. Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

53. **Adequacy – Federal Rules of Civil Procedure 23(a)(4):** Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' interests do not conflict with the interest of the Class Members she seeks to represent and has no claims antagonistic to the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex class actions and intend to prosecute this action vigorously. Plaintiffs will fairly and adequately protect the interests of Class Members.

54. **Superiority – Federal Rules of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Class Members to individually

seek redress for Defendants' wrongful conduct. Even if the Class Members could afford litigation the court system could not. It is likely that only a few class members could afford to seek legal redress for Defendants' misconduct. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Class treatment of common questions of law and fact would be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

55. Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.

56. The Class is also certifiable pursuant to Federal Rules of Civil Procedure 23(b)(1) and (2) because prosecuting separate action by Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the class; or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is

14

appropriate respecting the Class as a whole; and questions of law or fact common to Class Members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## COUNT I
## NEGLIGENCE
(*On Behalf of Plaintiffs and the Class Against All Defendants*)

57.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

58.     The Defendants had a duty of care to the Plaintiffs and the Class to inspect, repair, maintain, and operate the trains with which it transported hazardous materials. Defendants knew or should have known of the dangers of failing to inspect, repair, maintain or operate its trains and that such failure was a breach of duty resulting in the damages suffered by Plaintiffs and the Class Members.

59.     In the alternative, the derailment and subsequent exposure to hazardous chemicals was caused by defective, unfit and/or unsafe equipment, which was in the care, custody and control of Defendants. Defendants knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

60.     The derailment on February 3, 2023 and Plaintiffs' and Class Members' subsequent exposure to hazardous chemicals was caused by the negligence, carelessness and/or recklessness of the Defendants.

61.     Defendants owed Plaintiffs and the Class a duty to use reasonable care in the transportation of hazardous materials. The duties include, but are not limited to the duty to:

   i.   operate, maintain, inspect and/or repair the railcars in to ensure their safe and proper operation, particularly when transporting hazardous materials;

   ii.   establish proper procedures or systems, including but not limited to alarm systems, for identifying any malfunctions of the in order to prevent or mitigate derailments while transporting hazardous materials, and further establish safety procedures in the event of such a malfunction;

   iii.   properly load railcars consistent with accepted practice;

   iv.   properly train, manage, and supervise personnel as to matters including but not limited to dealing with fire, emergency braking procedures, derailment, and avoiding exposure to hazardous materials;

   v.   ensure adequate staffing levels;

   vi.   avoid populated areas when transporting hazardous materials;

   vii.   adequately warn those in danger of exposure to hazardous chemicals; and

   viii.   timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury.

62.    Defendants breached their duties to Plaintiffs and the Class by failing to:

   i.   operate, maintain, inspect and/or repair the railcars in to ensure their safe and proper operation, particularly when transporting hazardous materials;

   ii.   establish proper procedures or systems, including but not limited to alarm systems, for identifying any malfunctions of the in order to prevent or mitigate derailments while transporting hazardous materials, and further establish safety procedures in the event of such a malfunction;

   iii.   properly load railcars consistent with accepted practice;

iv.   properly train, manage, and supervise personnel as to matters including but not limited to dealing with fire, emergency braking procedures, derailment, and avoiding exposure to hazardous materials;

v.   ensure adequate staffing levels;

vi.   avoid populated areas when transporting hazardous materials;

vii.   adequately warn those in danger of exposure to hazardous chemicals; and

viii.   timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury.

63.     Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class, which were a direct and proximate result of the Derailment and release of hazardous substances which harmed Plaintiffs and the Class as described above.

64.     As a direct and proximate result of the Defendants' acts or omissions in the course of conducting this abnormally dangerous and/or ultra-hazardous activity, Plaintiffs and the Class suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

65.     Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class, which were a direct and proximate result of the train derailment and release of hazardous substances which harmed Plaintiffs and the Class as described above.

66.     Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class Members rights so as to warrant the imposition of punitive damages.

## COUNT II
## STRICT LIABILITY
(*On Behalf of Plaintiffs and the Class Against All Defendants*)

67.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

68.     Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Class pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

69.     The transportation of the toxic and flammable substance vinyl chloride is an abnormally dangerous and/or ultra-hazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

70.     The Defendants engaged in an abnormally dangerous and/or ultra-hazardous activity for which common law strict liability applies for transporting hazardous substances which Defendants knew to be dangerous and without taking proper precautions.

71.     Had the Defendants not engaged in the abnormally dangerous and/or ultra-hazardous activity, Plaintiffs would not have had their property contaminated or been exposed to dangerous levels of vinyl chloride or other toxic substances incurred damages.

72.     As a direct and proximate result of the Defendants' acts or omissions in the course of conducting this abnormally dangerous and/or ultra-hazardous activity, Plaintiffs and the Class suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or

illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

73.     Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class, which were a direct and proximate result of the train derailment and release of hazardous substances which harmed Plaintiffs and the Class as described above.

74.     Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

**COUNT III**
**MEDICAL MONITORING**
(*On Behalf of Plaintiffs and the Class Against All Defendants*)

75.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

76.     Plaintiffs and the individual Class Members have been exposed to vinyl chloride and hazardous chemicals at levels that are far higher than normal background levels. These substances are dangerous toxins that have been proven to cause cancer and other diseases in humans.

77.     The hazardous materials carried by the train, including vinyl chloride, are highly toxic substances.

78.     Plaintiffs and Class Members were exposed to these toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, due to Defendants' actions, including Defendants' negligent, ultra-hazardous, willful and wanton conduct.

79.     As a proximate result of their exposure to these toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, Plaintiffs and Class Members

have a significantly increased risk of developing diseases and cancer. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

80.     Plaintiffs and the Class should be awarded the costs of such a monitoring regime.

81.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and Class Members' rights so as to warrant the imposition of punitive damages.

### COUNT IV
### PRIVATE NUISANCE
(*On Behalf of Plaintiffs and the Class Against All Defendants*)

82.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

83.     At all times relevant hereto, Defendants knew or should have known that the hazardous chemicals being transported were harmful to real property and human beings, and that improper transportation and handling of these materials were substantially certain to cause injury to Plaintiffs and their residence.

84.     Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real and residential property located in the 30-mile radius surrounding the East Palestine Derailment site, including Plaintiffs' land, real property, residences, and persons.

85.     Defendants' contamination of Plaintiffs' real, residential and personal property has unreasonably interfered with the rights of Plaintiffs to use and enjoy their residence, causing them to suffer injuries different in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs and members of the Class to, among other things, refrain from occupying or using their real properties, refrain from using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home

gardens, or water pets and livestock. This has, in turn, caused significant loss of income, out of pocket expenses, emotional distress and inconvenience.

86.    Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

87.    Plaintiffs and Class Members suffered specific injuries as a result of Defendants' tortious conduct, including the pollution of their residences and/or adverse physical symptoms including, for example, respiratory issues and/or skin rashes from topical exposure to local water.

88.    Defendants' improper transportation and handling of hazardous chemicals constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs and the Class to suffer, and continue to suffer in the future, damage to their real property and/or residence, incur out of pocket expense, and/or personal property damage, and/or loss of use and enjoyment of property, diminution in property value, and/or annoyance, upset, aggravation or inconvenience, and/or emotional distress, and/or an increased risk of associated disease or illness, and/or the present need for medical monitoring to ensure early detection of any such disease or illness.

89.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

**COUNT V**
**PUBLIC NUISANCE**
(*On Behalf of Plaintiffs and the Class Against All Defendants*)

90.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

91.    At all times relevant hereto, Defendants knew or should have known that the hazardous chemicals being transported were hazardous and harmful to real property and human

21

beings, and it was substantially certain that improper transportation and handling of these materials was hazardous and harmful to property and people living in nearby areas.

92.     Plaintiffs and Class Members have a right to enjoy their real property free of dangerous contamination. Defendants' improper transportation and handling of hazardous materials substantially and unreasonably infringed upon these public rights.

93.     As a proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiffs' and the general public's common right to breathe clean air and have access to clean running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

94.     As a proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Defendants invaded and contaminated the areas surrounding Plaintiffs' and Class Members' residences, thereby exposing them to toxic chemicals and carcinogens.

95.     As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiffs and Class Members suffer, and will continue to suffer, real and/or residential property damage, incur out of pocket expense, and/or personal property damage, and/or loss of use and enjoyment of property, diminution in property value, and/or annoyance, upset, aggravation and/or inconvenience, and/or increased risk of associated disease or illness, and/or the need for medical monitoring to ensure early detection of any disease or illness.

96.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT VI
## STATUTORY NUISANCE
### (*On Behalf of Plaintiffs and the Class Against All Defendants*)

97.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

98.     Pursuant to Ohio R.C. § 3704.03, "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

99.     As a result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride, an air contaminant.

100.     As a result of Defendants' improper transportation and handling of hazardous materials, Plaintiffs and Class Members persons and/or property have been exposed to hazardous air pollutants in violation of Ohio and federal law.

101.     As a direct and proximate result of Defendants' improper transportation and handling of hazardous materials, these materials continuously invaded and contaminated the areas surrounding Plaintiffs, thereby exposing their property and/or persons to unsafe levels of vinyl chloride, butyl acrylate, benzene residue and other combustible liquids.

102.     As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue and other combustible liquids, and the exposure to these toxins resulting therefrom, Plaintiffs and the Class presently suffer, and will continue suffering in the future, real and/or residential property damage, incur out of pocket expense, and/or personal property damage, and/or loss of use and enjoyment of property, diminution in property value, and/or annoyance, upset, aggravation, and/or inconvenience and/or emotional distress, and/or increased risk of associated disease or illness, and/or the need for medical monitoring to ensure early detection of disease or illness.

103.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and Class Members' rights so as to warrant the imposition of punitive damages.

**COUNT VII**
**TRESPASS**
(*On Behalf of Plaintiffs and the Class Against All Defendants*)

104.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

105.     At all times relevant hereto, Defendants knew or should have that the hazardous chemicals being transported were hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these hazardous materials would cause injury to Plaintiffs and their residences.

106.     Defendants allowed hazardous materials to enter and contaminate Plaintiffs' and Class Members' residence or property. They intentionally, knowingly, and negligently used, discharged, spread, deposited and/or released these hazardous materials knowing that those toxins would contaminate the real property, residential areas and drinking water of individuals like Plaintiffs.

107.     Defendants authorized or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials to enter and contaminate Plaintiffs' and Class Members property or residence.

108.     At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' and Class Members right to enjoy a safe residence and environment.

109.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and Class Members' rights so as to warrant the imposition of punitive damages.

### COUNT VIII
### WILLFUL AND WANTON CONDUCT
(*On Behalf of Plaintiffs and the Class Against All Defendants*)

110.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

111.    At all times relevant, Defendants owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class.

112.    Upon information and belief, Defendants were, at all times relevant, aware that the hazardous materials they transported were highly carcinogenic and/or otherwise harmful to humans.

113.    Upon information and belief, Defendants were, at all times relevant, aware of the health risks associated with the release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride into the air, water, and land, including the risk of causing various diseases and cancers.

114.    Upon information and belief, Defendants were at all relevant times aware that their transportation and release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities.

115.    Upon information and belief, Defendants were aware that at least one railcar was malfunctioning for approximately 20 miles before the derailment occurred.

116.    Notwithstanding this actual knowledge, Defendants breached their duties by, among other things, failing to:

    i.   operate, maintain, inspect and/or repair the railcars in a safe manner to ensure their safe and proper operation, particularly when transporting hazardous materials;

    ii.   establish proper procedures or systems, including but not limited to alarm systems, for identifying any malfunctions of the in order to prevent or mitigate derailments while transporting hazardous materials, and further establish safety procedures in the event of such a malfunction;

    iii.   properly load railcars consistent with accepted practice;

    iv.   properly train, manage, and supervise personnel as to matters including but not limited to dealing with fire, emergency braking procedures, derailment, and avoiding exposure to hazardous materials;

    v.   ensure adequate staffing levels;

    vi.   avoid populated areas when transporting hazardous materials;

    vii.   adequately warn those in danger of exposure to hazardous chemicals;

    viii.   timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury; and

    ix.   otherwise unreasonably cause injury to Plaintiffs and Class Members as will be determined by further investigation and discovery.

117.    Defendants' failures in these and other respects constitute willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and Class Members.

118.    As a direct and proximate result of Defendants' willful, wanton, reckless and outrageous transportation, emission, discharge, and release of hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride, throughout the Class

Zone, Plaintiffs and the Class suffer, and will continue suffering in the future, real and/or residential property damage, incur out of pocket expense, and/or personal property damage, and/or loss of use and enjoyment of property, diminution in property value, and/or annoyance, upset, aggravation or inconvenience and/or emotional distress, and/or an increased risk of associated disease or illness, and/or the need for medical monitoring to ensure early detection of any such disease or illness.

119.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and Class Members' rights so as to warrant the imposition of punitive damages.

### COUNT IX
### DAMAGES
(*On Behalf of Plaintiffs Against All Defendants*)

120.    As a direct and proximate result of Defendants' negligence, trespass, and nuisance, Plaintiffs and Class Members have suffered damages including, but not limited to the following:

    i.   costs of medical treatment; past, present and future; and/or

    ii.   past, present and future lost wages; and/or

    iii.   past, present and future mental anguish; and/or

    iv.   personal injuries; and/or

    v.   pain and suffering past, present and future; and/or

    vi.   loss of enjoyment of life; and/or

    vii.   loss of use of their property, both personal and real; and/or

    viii.   contamination and loss of value to their property; and/or

    ix.   other damages to be shown at trial.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually, and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against each Defendant as follows:

    a)    for an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

    b)    for damages, including compensatory, punitive and exemplary damages, in an amount determined just and reasonable;

    c)    for an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

    d)    for prejudgment interest on all amounts awarded;

    e)    for injunctive and declaratory relief, as allowed by law; and

    f)    such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

DATED:  March 2, 2023

Respectfully submitted,

/s/ *Alyson Steele Beridon*
Alyson Steele Beridon (#87496)
**Herzfeld, Suezhotz, Gastel, Lenski**
   **& Wall, PLLC**
425 Walnut Street
Suite 2315
Cincinnati, OH 45202
Phone: (513) 381-2224
Email: alyson@hsglawgroup.com

Benjamin A. Gastel*
**Herzfeld, Suezhotz, Gastel, Lenski**
   **& Wall, PLLC**
223 Rosa L. Parks Ave.
Suite 300
Nashville, TN 37203
Phone: (615) 636-2004
Email: ben@hsglawgroup.com

28

Jeffrey A. Barrack*
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Phone: (215) 963-0600
Email: jbarrack@barrack.com

Stephen R. Basser*
Samuel M. Ward*
**BARRACK, RODOS & BACINE**
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Phone: (619) 230-0800
Email: sbasser@barrack.com

John G. Emerson*
**EMERSON FIRM, PLLC**
2500 Wilcrest Drive, Suite 300
Houston, TX  77042
Phone: (800) 551-8649
Email: jemerson@emersonfirm.com

*application for admission pro hac vice
forthcoming*